UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE: BIG BUCK BREWERY & STEAKHOUSE, INC.,
d/b/a BIG BUCK BREWERY AND STEAKHOUSE
and d/b/a AUBURN HILL WINERY,

        Debtor-in-Possession.
_____/

BIG BUCK BREWERY AND
STEAKHOUSE, INC.,

        Counter-Defendant        Bkrptcy No. 07-04213-SWR
        and Appellee,        HON. STEVEN RHODES
vs.        Case No. 08-CV-12471
        HON. GEORGE CARAM STEEH

MICHAEL G. EYDE,

        Counter-Plaintiff
        and Appellant.
_____/

OPINION AND ORDER AFFIRMING MAY 30, 2008
DECISION AND JUDGMENT

Appellants Michael Eyde, Eyde Brothers Development Co., L.L.C., and Land One L.L.C., appeal from a May 30, 2008 adversary proceeding judgment entered by Bankruptcy Judge Steven Rhodes against Big Buck Brewery & Steakhouse, Inc. in the amount of $13,640.00 for damages resulting from Big Buck's removal of fixtures and other personal property from Eyde's building. A hearing was held on December 16, 2008. Eyde's Counsel appeared by teleconference and was granted leave to file a written response to the arguments advanced by Big Buck at the hearing. Eyde filed a "Rebuttal to Oral Argument" on December 30, 2008. For the reasons set forth below, the May 30, 2008 decision and judgment will be AFFIRMED.

I.

Former debtor-in-possession Big Buck operated an Auburn Hills, Michigan restaurant, filing for Chapter 11 bankruptcy protection on June 10, 2004. Following this court's May 25, 2005 affirmance of the Bankruptcy Court's determination that a 1997 sale and ground-leaseback transaction between Big Buck and Eyde was not a bona fide lease, 11 U.S.C. § 365(d), the parties executed a February 14, 2006 "Settlement Agreement," and a December 7, 2006 "Stipulation Granting Debtor Limited License for Use of Real Property." The Settlement Agreement and Stipulation granted Big Buck the right to retain possession of the restaurant premises until January 15, 2007. Paragraph 6 of the Settlement Agreement provides:

> 6. The Debtor [Big Buck] shall have the right to remove its personal property, including furniture, trade fixtures and equipment (not including the Brewery Equipment, which shall be governed by the Personal Property Option) from the Premises within 30 days after receipt of Eyde's written notice that he is not exercising the Personal Property Option. In removing any of the Debtor's personal property, including furniture, trade fixtures and equipment including the Brewery Equipment if applicable (i) the Debtor shall use its best efforts to minimize damage to the Premises, and (ii) the Debtor shall repair to as least as good condition any damage caused by such removal, such as, but not limited to, damage to plate glass windows and removal of walls and doors. Debtor shall not be obligated to replace floor or wall coverings or paint exposed as a result of removal of fixtures, or to remove electrical, mechanical or physical connection points for fixtures including but not limited to wiring drops, footings, brackets and exhaust vents. That debtor shall ensure that any openings to the exterior of the building created due to the removal of any equipment are closed or otherwise sealed to weather. <u>The Debtor shall leave the Premises in a safe condition</u>. The Debtor shall notify Mr. Eyde of the dates and times of the removal of the personal property as provided elsewhere in this Agreement, or if not otherwise provided, at least forty-eight (48) hours prior to such actions, and Mr. Eyde shall be entitled to have a representative present to supervise the removal.

(emphasis added).

Big Buck removed walk-in coolers from the south wall of the building on January 14, 2007, and vacated the premises on January 16, 2007. Eyde representatives inspected the building on January 23, 2007. The record indicates an attorney for Eyde left a roof door open following the inspection. In a February 12, 2007 letter from Eyde representative Don

Cuthbert to Big Buck Chief Executive Officer Joel Flowers, Eyde demanded $60,400.00 to repair and restore the building, asserting that "the crew that handled the removal of the equipment and the restoration of the facility did a less than professional job." Among other complaints, Cuthbert wrote:

> Several areas were covered with mold.  The wall covering and insulation would need to be removed and disposed of.  The areas would need to be sanitized and the insulation and wall covering replaced.

Cuthbert and Flowers inspected the premises on February 17, 2007, and discovered that a 1 1/2 inch diameter pipe behind a northeast wall had frozen and burst, causing water to flow into the walls and carpeting.  Cuthbert repaired the pipe approximately a week later, but did not extract the water from the walls or carpet.

On March 9, 2007, Big Buck filed a complaint in Bankruptcy Court seeking declaratory relief that it was in full compliance with the terms of the Settlement Agreement. Eyde filed a Counter-Complaint alleging breach of the Settlement Agreement, breach of implied contract, and waste.  Following a six-day adversary proceeding, Bankruptcy Judge Rhodes determined that Big Buck was liable under Eyde's breach of contract counter-claim for $13,640.00.  Judge Rhodes also found that Big Buck was not liable for remediation of the mold found within the building.  Specifically, Judge Rhodes held that Big Buck had not breached its contractual duty arising under Paragraph 6 of the Settlement Agreement – "Debtor shall leave the Premises in a safe condition." – interpreting this sentence of Paragraph 6 as applicable only in the context of Big Buck's removal of fixtures and personal property from the building as opposed to a general undertaking.  May 30, 2008 Tr., at 60. Judge Rhodes held that Big Buck "was obligated to remedy any unsafe condition only to the extent that such unsafe conditions resulted from the removal of its personal property." Id. at 62.  As the fact-finder, Judge Rhodes determined that Eyde failed to prove by a

3

preponderance of the evidence that Big Buck's removal of its personal property and fixtures created or exasperated any unsafe condition with respect to the mold on the premises. Id. at 63.

> . . . . [I]t is significant to the Court, although no means controlling, that in the interim five or six months between the time that Big Buck vacated the premises and the Eyde Entities experts began their investigations, there was significant water intrusion into the building from the burst pipe which allowed water to flow freely into the building for several days. In these circumstances, the Court must conclude that the evidence simply does not allow a finding, and it's certainly none in the Eyde's favor, the issue of the extent to which the mold on the premises was a result of that water intrusion or conditions that existed before Big Buck vacated the premises.
>
> Now, it is certainly true that the removal of the cooler walls exposed the mold that was pre-existing along the south wall. Nevertheless, it does not logically follow in the Court's view that the removal of the cooler walls is what caused the south wall to be left in an unsafe condition. The removal of the cooler walls did not cause the mold. Rather, the evidence establishes that the mold was caused by a water leak from a defective roof or a defective scoffer [sic] system.
>
> In the end the Court must find that the Eyde Entities have not carried their burden of proof that the mold condition, and the mold contamination on the premises was caused by or measurably worsened by the manner in which Big Buck removed its personal property.

Id. at 63-64. It is from this decision that Eyde appeals.

II.

A bankruptcy court's legal conclusions are reviewed de novo. Investors Credit Corp. v. Batie, 995 F.2d 85, 88 (6th Cir. 1993). A district court is bound by the bankruptcy court's findings of fact unless they are clearly erroneous, with due regard given to the opportunity of the bankruptcy court to judge the credibility of the witnesses. Bankr. Rule 8013. A bankruptcy judge's findings of fact are clearly erroneous when, although there is evidence to support them, the reviewing court is left with a definite and firm conviction that a mistake has been made. In re Rembert, 141 F.3d 277, 280 (6th Cir. 1998).

III.

4

Eyde argues the Bankruptcy Court erred in interpreting Big Buck's unambiguous contractual duty to "leave the Premises in a safe condition" as applying only in the context of Big Buck's removal of fixtures and personal property from the building. A court's obligation in interpreting a written contract is to discern the contracting parties' intent. Quality Products and Concepts Co. v. Nagel Precision, Inc., 469 Mich. 362, 375, 666 N.W.2d 251 (2003) (citing Sobczak v. Kotwicki, 347 Mich. 242, 249, 79 N.W.2d 471 (1956)). This intent is to be determined from a reading of the instrument as a whole in light of the surrounding circumstances. Cleveland v. Detroit Trust Co., 264 Mich. 253, 257, 249 N.W.2d 842 (1933). If the contract language is clear and unambiguous, the contract is construed as a matter of law and enforced as written unless contrary to public policy. Quality Products, 469 Mich. at 375 (citing Farm Bureau Mut. Ins. Co. of Michigan v. Nikkel, 460 Mich. 558, 570, 596 N.W.2d 915 (1999)); Port Huron Ed. Ass'n v. Port Huron Area School Dist., 452 Mich. 309, 323, 550 N.W.2d 228 (1996) (citing Dykema v. Muskegon Piston Ring Co., 348 Mich. 129, 138, 82 N.W.2d 467 (1957)). "Contractual language is construed according to its plain and ordinary meaning, and technical or constrained constructions are to be avoided." UAW-GM Human Resource Center v. KSL Recreation Corp., 228 Mich. App. 486, 491-492, 579 N.W.2d 422 (1998) (quoting Dillon v. DeNooyer Chevrolet Geo, 217 Mich. App. 163, 166, 550 N.W.2d 846 (1996)).

The February 14, 2006 Settlement Agreement was executed by the parties in anticipation of a future Bankruptcy Court order confirming Big Buck's proposed "Third Amended Plan of Reorganization as Modified." Settlement Agreement, ¶ 1, at 1-2. See also December 7, 2006 Stipulation, ¶ 1, at 1 (recognizing that "Mr. Eyde and [Big Buck] entered into a Settlement Agreement February 14, 2006 . . . pursuant to which [Big Buck's] disputes with Mr. Eyde were resolved and [Big Buck] was able to confirm a plan of

5

reorganization."). Paragraph 2 of the Settlement Agreement addressed Big Buck's interim right to retain possession of the building and continue doing business contingent upon Big Buck paying property taxes, monthly rent, utilities, and insurance premiums, and subject to Eyde's continuing right to inspect the property on 24-hour notice. Id. ¶ 2, at 2-7. Under Paragraph 2, Big Buck was required during this period "to maintain the Premises in good condition, ordinary wear and tear excepted." Id. ¶ 2(b)(viii), at 5. See also id. ¶ 2(b)(vii), at 4-5. Paragraph 2 also empowered the Bankruptcy Court to enter orders of eviction and possession in favor of Eyde in the event Big Buck failed to timely remit rent or pay property taxes. Id. ¶ 2, at 5-6. Paragraph 3 of the Settlement Agreement gave Big Buck an option to purchase the building by providing written notice to Eyde no later than November 15, 2006, and closing the purchase no later than December 15, 2006. Id. ¶ 3, at 7-8. Paragraph 4 provided that Big Buck would surrender the premises to Eyde if Big Buck failed to timely exercise its purchase option or failed to close the purchase by December 15, 2006. Id. ¶ 4, at 9. Paragraph 5 gave Eyde an option to purchase Big Buck's "brewing equipment, the built-in bar equipment and built-in kitchen equipment." Id. ¶ 5, at 10. Paragraph 6 gave Big Buck the right to remove its "furniture, trade fixtures, and equipment," not including the equipment subject to Eyde's Paragraph 5 purchase option, within 30 days after Eyde notified Big Buck that Eyde was not exercising its Paragraph 5 purchase option. Id. ¶ 6, at 12. In removing the "furniture, trade fixtures, and equipment" as described in Paragraph 6, Paragraph 6 provides that Big Buck owed the contractual duties to "leave the Premises in a safe condition," and to "repair to at least as good condition any damage caused by such removal such as, but not limited to, damage to plate glass windows and

removal of walls and doors." Id. ¶ 6, at 13.[1]  Under a license that extended Big Buck's right to possess the building through January 15, 2007[2], the pertinent terms of the Settlement Agreement remained "in full force and effect."  December 7, 2006 Stipulation, ¶ 6, at 3.

Reading the Settlement Agreement as a whole and in light of the surrounding circumstances, Big Buck's contractual duty to "leave the Premises in a safe condition" unambiguously applied only to Big Buck's removal of the "furniture, trade fixtures, and equipment" described in Paragraph 6.  Detroit Trust Co., 264 Mich. at 257; Quality Products, 469 Mich. at 375.  Paragraph 2, in contrast, imposed the more general duty upon Big Buck "to *maintain* the Premises in good condition, ordinary wear and tear excepted." Settlement Agreement, ¶ 2(b)(viii), at 5 (emphasis added).  Paragraph 2 contemplated Big Buck's maintenance of the building while in possession, while Paragraph 6 contemplated Big Buck's "remov[al] [of] its personal property . . . from the Premises[.]"  Settlement Agreement, ¶ 6, at 12 (emphasis added).  The context of Big Buck's duty to "leave the Premises in a safe condition" is made clear by the subject matter of Paragraph 6 as illustrated by the sentences immediately preceding and following the "leave the Premises in a safe condition" language of Paragraph 6:

> . . . . [Big Buck] shall ensure that any openings to the exterior of the building created <u>due to the removal</u> of any equipment are closed or otherwise sealed to weather. [Big Buck] shall leave the Premises in a safe condition.  The Debtor shall notify Mr. Eyde of the dates and times <u>of the removal of the personal property</u> as provided elsewhere in this Agreement, or if not otherwise provided, at least forty-eight (48) hours prior to such actions, and

---

[1]  The remaining Paragraphs 7-25 of the Settlement agreement set forth additional contractual duties owing by the parties that warrant no further discussion.

[2]  Consistent with Paragraph 2 of the Settlement Agreement, the Bankruptcy Court granted Eyde's motion for an order of eviction and writ of restitution on December 4, 2006.  See December 7, 2006 Stipulation, ¶ 2, at 2.

7

>Mr. Eyde shall be entitled to have a representative present <u>to supervise the removal</u>.

Settlement Agreement, ¶ 6, at 12 (emphasis added). Paragraph 2, governing Big Buck's contractual duty to maintain the premises, provides the broader obligation that the building be kept "in good condition, ordinary wear and tear excepted[.]" <u>Id</u>. ¶ 2(b)(vii, viii), at 4-5. The court need not decide the issue of whether maintaining the building under "good condition" pursuant to Paragraph 2 implicitly included a duty to maintain the premises "in a safe condition" because Eyde pursued its breach of contract claim in the adversary proceeding before Bankruptcy Judge Rhodes under the exclusive theory that Big Buck breached Paragraph 6. <u>See</u> May 30, 2008 Tr., at 58-59.[3] Eyde did not allege in the adversary proceeding, and properly does not argue on appeal, that it is entitled to recovery under Paragraph 2 of the Settlement Agreement. "[I]t is a long-standing principle of jurisprudence that an appellate court should not pass on issues not raised at the trial level." <u>In re Charfoos</u>, 979 F.2d 390, 395 (6th Cir. 1992).

Eyde's argument that Judge Rhodes found Big Buck's Paragraph 6 duty to "leave the Premises in a safe condition" was ambiguous is not supported by the record. Judge Rhodes made no such finding of ambiguity. The court notes that Judge Rhodes was permitted to look outside the four corners of the Settlement Agreement to dispose of any potential ambiguity. <u>See</u> <u>Wonderland Shopping Center Venture Ltd. Partnership v. CDC Mortgage Capital, Inc.</u>, 274 F.3d 1085, 1095 (6th Cir. 2001). Regardless, this court has construed the Settlement Agreement <u>de novo</u>. <u>Investors Credit</u>, 995 F.2d at 88. Eyde's

---

[3] Bankruptcy Judge Rhodes explains that "[t]he record of this case, including the first amended, joint pretrial statement and order, the opening statements, the arguments made by counsel at the conclusion of the Eyde Entities case, and the closing arguments made here today, make it abundantly clear that the Eyde Entities claim for damages arising from the mold on the premises arises from its claim that Big Buck breached paragraph six of the settlement agreement, and not any other provision of the settlement agreement."

8

argument that Big Buck's duty to "leave the Premises in a safe condition" speaks for itself ignores this court's duty to construe the Settlement Agreement as a whole in light of the circumstances under which it was executed. Detroit Trust Co., 264 Mich. at 257; Quality Products, 469 Mich. at 375. Eyde's hyper-technical construction of the Settlement Agreement is without merit. UAW-GM Human Resource Center, 228 Mich. App. at 491-492.

The court concludes as a matter of law, as did Bankruptcy Judge Rhodes, that Big Buck's contractual duty to "leave the Premises in a safe condition" under Paragraph 6 of the Settlement Agreement obligated Big Buck to remedy only those unsafe conditions caused by Big Buck's removal of its personal property from the building. Quality Products, 469 Mich. at 375; Investors Credit, 995 F.2d at 88.

IV.

Bankruptcy Judge Rhodes found that Eyde failed to prove that the building's mold condition and contamination were caused by or measurably worsened by the manner in which Big Buck removed its personal property from the premises. May 30, 2008 Tr., at 64. Stated differently for purposes of proximate cause, Judge Rhodes determined that the alleged unsafe mold condition within the building did not naturally arise from Big Buck's removal of its furniture, trade fixtures, and equipment on January 14 and 15, 2007. See Kewin v. Massachusetts Mut. Life Ins. Co., 409 Mich. 401, 414, 295 N.W.2d 50 (1980) (citing Hadley v. Baxendale, 9 Exch. 341; 156 Eng. Rep. 145 (1854)).

The record shows that two major areas of the building were identified as sources of water and mold: (1) the south wall behind Big Buck's walk-in coolers, and; (2) the northeast and northwest walls. Big Buck removed its coolers and portions of the south wall on January 15, 2007, and vacated the premises on January 16, 2007. Eyde took possession

9

of the building on January 16, 2007 and turned down the heat.  On January 23, 2007, Eyde inspected the building and discovered mold along the south wall where the coolers had been removed.  An Eyde attorney inadvertently left a roof door open during this inspection, apparently causing a 1 1/2 " pipe running along the northeast wall to freeze and burst, allowing water to accumulate inside the building walls. This pipe break was first discovered by Big Buck and Eyde on February 17, 2007.  Eyde's Cuthbert did not repair the pipe until February 24, 2007, and he did not clean up the water that had accumulated in the walls and on the carpeted floor.

Eyde expert witness Thomas Krueger first inspected the building in July, 2007. During the approximate five-month period from January 16, 2007 when Eyde took possession of the building, until July 2, 2007 when Krueger performed his initial inspection, the building experienced extensive "foot traffic."  Krueger opined that all of the mold occurred while Big Buck was still in possession of the premises, that the mold dried and its spores became airborne well before his July 2007 inspection, and that Big Buck's removal of the cooler on the south wall could cause the mold to become airborne.  Krueger opined that mold found along a northwest wall was airborne, and that all of the mold within the building required remediation.  Krueger admitted he could not testify regarding the quality of the air inside the building as of January 15, 2007.

Big Buck expert witness Connie Morbach testified that Eyde's failure to remove the water accumulating from the burst pipe immediately after it was discovered on February 17, 2007 caused mold to grow within and along the northeast wall, and that the "foot traffic" that occurred from February 17, 2007 to July 2007 caused the mold to spread throughout the premises. Big Buck expert Jim Partridge opinioned that the mold found within the south wall behind Big Buck's coolers was from a defective roof and scupper system, not the

10

coolers.[4]  Morbach testified that the "statchybotrys" mold is a mold that must dry before it becomes airborne and unsafe.  Morbach opined that the building was not unsafe from airborne mold as of January 16, 2007.  Expert Kenneth Lawler testified that carpeting at premises remained saturated with water when he inspected the building in August 2007.

From this and other evidence presented during the six-day adversary proceeding, Bankruptcy Judge Rhodes could conclude that Big Buck's removal of its personal property from the building in January 2007 did not cause the allegedly unsafe mold condition on the premises first discovered by Krueger in July 2007.  Judge Rhodes could reasonably find that the only relevant act committed by Big Buck with respect to the removal of its personal property from the premises in January 2007 was the act of removing portions of the south wall to facilitate removal of the cooler.  Big Buck could only be found to have breached Paragraph 6 of the Settlement Agreement if the alleged airborne mold condition discovered in July 2007 naturally arose from, or was proximately caused by, Big Buck's January 2007 removal of part of the south wall.  Big Buck proffered evidence able to support a finding that intervening events, unrelated to the removal of part of the south wall, proximately caused the airborne mold condition, including the failure to timely repair the burst pipe and clean up the walls and carpeting, the failure to repair the faulty roof and scuppers, and the extensive "foot traffic" that occurred after Eyde took possession of the building on January 17, 2007.  Bankruptcy Judge Rhode's finding that Eyde did not prove it was more likely than not that Big Buck's partial removal of the south wall caused an unsafe condition is reasonable in light of the totality of the evidence.  It was for Judge Rhodes to decide the credibility of each witness that testified before him, both lay and expert, and to determine

---

[4]  A "scupper" is defined to include "any opening in the side of a building, as in a parapet, for draining of rain water."  The Random House College Dictionary, Rev. Ed. 1980.

the weight, if any, given to the testimony. Bankr. Rule 8013. The court declines Eyde's invitations to assess the credibility of the expert witnesses and resolve conflicting evidence.

Upon reviewing the plethora of record evidence, the court is not left with a definite and firm conviction that Bankruptcy Judge Rhodes erred in concluding that the alleged unsafe mold condition was not caused by Big Buck's removal of its personal property from the premises. Kewin, 409 Mich. at 414; In re Rembert, 141 F.3d at 280; Bankr. Rule 8013.

V.

The Bankruptcy Court's May 30, 2008 decision and judgment is hereby AFFIRMED.

SO ORDERED.

Dated: January 8, 2009

                                                s/George Caram Steeh
                                                GEORGE CARAM STEEH
                                                UNITED STATES DISTRICT JUDGE

---

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on January 8, 2009, by electronic and/or ordinary mail.

s/Marcia Beauchemin
Deputy Clerk

---